UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL HOUSE and MICHELLE HOUSE,

               Plaintiffs,

v.

JOHNSON CONTROLS, INC.,

               Defendant.

_____/

Case No. 04-71659

Hon. Gerald E. Rosen

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     March 24, 2006

PRESENT: Honorable Gerald E. Rosen
United States District Judge

## I. INTRODUCTION

Plaintiff Paul House and his wife, Michelle House, brought this suit in a Michigan

circuit court in February of 2004, asserting state-law personal injury and loss of

consortium claims against Paul House's employer, Defendant Johnson Controls, Inc.[1]

These claims arise from an April 4, 2002 incident at one of Defendant's plants, when

Plaintiff's foot was crushed by a falling I-beam as he and co-workers were engaged in a

"die-flipping" procedure. Defendant removed the case to this Court on May 3, 2004,

---

[1] Because Michelle House's loss of consortium claim is entirely derivative of and
dependent upon her husband's personal injury claim, the Court will refer to Paul House as the
sole plaintiff throughout the balance of this opinion.

citing diversity of citizenship among the parties.

By motion filed on December 29, 2004, Defendant now seeks summary judgment in its favor under the "exclusive remedy" provision of Michigan's Worker's Disability Compensation Act ("WDCA"), Mich. Comp. Laws § 418.101 *et seq.* The provision in question states that the benefits awarded to an employee under the WDCA "shall be the employee's exclusive remedy against the employer for a personal injury" suffered on the job, with the "only exception" being "an intentional tort." Mich. Comp. Laws § 418.131(1). In support of the present motion, Defendant argues that the record fails as a matter of law to trigger this "intentional tort" exception to the WDCA's exclusive remedy provision. Plaintiff filed a response on January 18, 2005, citing evidence which, in his view, raises issues of fact as to the application of this exception. On January 27, 2005, Defendant filed a reply in further support of its motion.

Having reviewed the parties submissions and the remainder of the record, the Court finds that the relevant allegations, facts, and legal arguments are thoroughly presented in these materials, so that oral argument would not significantly aid the decisional process. Accordingly, the Court will decide Defendant's motion "on the briefs." See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. For the reasons set forth below, the Court finds that Defendant's motion should be granted, in light of the stringent definition of an "intentional tort" as set forth in the WDCA and construed by the Michigan courts.

## II. **FACTUAL BACKGROUND**

2

For present purposes, the Court views the record in a light most favorable to Plaintiff as the non-moving party. At the time of the incident at issue, Plaintiff Paul House worked in the maintenance department at one of Defendant Johnson Controls' Michigan facilities.

Plaintiff sustained his injuries on April 4, 2002, as he and his co-workers were engaged in a "die-flipping" procedure. The dies are large pieces of equipment used in the manufacturing process, ranging in size from 5-by-8 feet to 8-by-8 feet and weighing from 5,000 to 25,000 pounds. To flip these dies, the workers attached chains to bolts on two opposing sides of the dies, and then attached the other ends of the chains to the two ends of a steel I-beam. The workers then used a forklift to lift the I-beam into the air, which would cause the die to flip over as it, along with the attached I-beam, was lifted off the ground.

On the occasion in question, the workers had picked up and flipped a die with a forklift, but encountered a problem while lowering the die back down to the floor. According to Plaintiff's deposition testimony, the die would not lie down flat on the ground, but instead remained unevenly positioned more on one end than the other. Plaintiff motioned for the forklift driver to stop, and then ran around to the other side of the die in an attempt to identify the cause of the problem. As he did so, the steel I-beam fell off of the two forks of the forklift, bounced off of the cement floor, and landed on and crushed Plaintiff's lower leg.

3

At his deposition, Plaintiff was unable to say what had caused the I-beam to become dislodged from the forklift and fall to the floor. He was unsure whether one of the chains connecting the I-beam to the die had broken, or whether enough slack had developed in the chains to permit the I-beam to slide off the ends of the forks. The remainder of the record, including an accident report generated after the incident, is similarly inconclusive as to the precise cause of the I-beam falling from the forklift.

There is evidence in the record of a widespread belief among the employees at Defendant's plant that this die-flipping procedure was dangerous. Specifically, Plaintiff testified that he had expressed this view to his immediate supervisors, and that they "knew it was dangerous" and "told me that it was dangerous." (Plaintiff's Response, Ex. 1, Plaintiff's Dep. at 94.) Plaintiff also has produced an affidavit from one of his supervisors at the time, Carl Hawkins, stating that he had "actual knowledge" prior to the date of Plaintiff's injury that this die-flipping process "was dangerous" and that "there had not been adequate safeguards employed to avoid injury to employees involved in" this process. (Plaintiff's Response, Ex. 2, Hawkins Aff. at ¶¶ 6-7.)

In addition, Plaintiff has produced evidence that the plant management was aware of these safety concerns yet failed to take any corrective action. Plaintiff testified at his deposition, for example, that he was told by his immediate supervisors "that they were in discussions with upper management to try to get new equipment" for flipping the dies, and that management had obtained quotes for this equipment, but that "they chose not to

4

spend the money to buy the equipment." (Plaintiff's Response, Ex. 1, Plaintiff's Dep. at 94.) Similarly, Carl Hawkins stated in his affidavit that "discussions were held with [Defendant's] management concerning the purchase of equipment to avoid injuries to employees performing the die flipping procedure," but that "[t]he decision was made to for[]go the purchase of the equipment." (Plaintiff's Response, Ex. 2, Hawkins Aff. at ¶ 11.)

Finally, Plaintiff has produced evidence, albeit rather vague in nature, as to another incident that arose as a result of this die-flipping procedure. Plaintiff testified to his "understand[ing]" that an I-beam had fallen off a forklift during this procedure "in the past," but he learned about this other incident only after he suffered his injury, and he was not aware of anyone else having sustained any injuries in the die-flipping process. (Plaintiff's Response, Ex. 1, Plaintiff's Dep. at 88.) Carl Hawkins also stated in his affidavit that, prior to the date of Plaintiff's injury, he had "actual knowledge that an accident had occurred during this [die-flipping] process involving a different employee." (Plaintiff's Response, Ex. 2, Hawkins Aff. at ¶ 9.) The record otherwise sheds no further light on this prior incident.

## III. ANALYSIS

### A.     The Standards Governing Defendant's Motion

Through the present motion, Defendant seeks an award of summary judgment in its favor on Plaintiff's personal injury and derivative loss of consortium claims. Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

For present purposes, the relevant facts are essentially undisputed, and the disposition of Defendant's motion turns entirely upon a question of law. Simply stated, the issue is whether the record, viewed in a light most favorable to Plaintiff, could support an award of damages for Plaintiff's work-related injury despite the "exclusive remedy" provision of Michigan's Worker's Disability Compensation Act. The Court now turns to this question.

### B.     Plaintiff's Personal Injury Claim Is Foreclosed by the "Exclusive Remedy" Provision of Michigan's Worker's Disability Compensation Act.

#### 1.     The Governing Statutory Terms and Michigan Supreme Court Ruling

Before addressing the specific facts and circumstances presented in this case, the Court begins its analysis by surveying the pertinent provisions of Michigan's Worker's Disability Compensation Act ("WDCA"), Mich. Comp. Laws § 418.101 *et seq.*, as well as a Michigan Supreme Court decision that construed these statutory terms. This survey

6

necessarily begins with the WDCA's "exclusive remedy" provision, which generally

limits an employee's recovery for a work-related injury to the benefits conferred under

the WDCA itself:

> The right to the recovery of benefits as provided in this act shall be
> the employee's exclusive remedy against the employer for a personal injury
> or occupational disease. The only exception to this exclusive remedy is an
> intentional tort. An intentional tort shall exist only when an employee is
> injured as a result of a deliberate act of the employer and the employer
> specifically intended an injury. An employer shall be deemed to have
> intended to injure if the employer had actual knowledge that an injury was
> certain to occur and willfully disregarded that knowledge. The issue of
> whether an act was an intentional tort shall be a question of law for the
> court.

Mich. Comp. Laws § 418.131(1).

In Travis v. Dreis & Krump Manufacturing Co., 453 Mich. 149, 551 N.W.2d 132

(1996), the Michigan Supreme Court construed the operative terms of this "exclusive

remedy" provision and its "intentional tort" exception. First, regarding the statutory

stipulation that an intentional tort requires a "deliberate act of the employer," the Court

found that this phrase "encompass[es] both commissions and omissions," thereby

reaching "a situation in which an employer consciously fails to act." Travis, 551 N.W.2d

at 141-42. Next, the Court reasoned that the statutory requirement of "specific[] inten[t]"

to injure could not be satisfied by "mere knowledge and appreciation of a risk," or even

by an employer's "substantial[] certain[ty] that injury will result from his acts." 551

N.W.2d at 142 (internal quotation marks and citation omitted). Rather, the Court

construed this language as requiring proof that "in acting or failing to act, the employer

7

must have determined to injure the employee; in other words, he must have had the particular purpose of inflicting an injury upon his employee." 551 N.W.2d at 142 (footnote omitted).

The Court then turned to the next sentence of the "exclusive remedy" provision. The Court read this sentence as establishing "a substitute means of proving the intent to injure element of the [prior] sentence," applicable in cases where "there is no direct evidence of intent to injure, and intent must be proved with circumstantial evidence." 551 N.W.2d at 143. In such cases, an employer's "actual knowledge" must be shown, meaning that "constructive, implied, or imputed knowledge is not enough," and that it also is not "sufficient to allege that the employer should have known, or had reason to believe, that injury was certain to occur." 551 N.W.2d at 143. Instead, in cases involving corporate employers, the plaintiff must "show[] that a supervisory or managerial employee had actual knowledge that an injury would follow from what the employer deliberately did or did not do." 551 N.W.2d at 143.

The actual knowledge required under this sentence is that "an injury was certain to occur." The Court reasoned that this language "set[s] forth an extremely high standard," under which "the laws of probability . . . play no part" and "conclusory statements by experts are insufficient." 551 N.W.2d at 143. Nor does it suffice to demonstrate an employer's knowledge "that a dangerous condition exists" — rather, the employer must "be aware that injury is certain to occur from what the actor does." 551 N.W.2d at 144.

8

As an example of facts that would satisfy this requirement of "actual knowledge" of "certain injury," the Court posited a case in which "an employer subjects an employee to a continuously operative dangerous condition that it knows will cause an injury, yet refrains from informing the employee about the dangerous condition so that he is unable to take steps to keep from being injured." 551 N.W.2d at 145.

Finally, the Court addressed the statutory requirement that an employer must "willfully disregard[]" its knowledge that an injury was certain to occur. In the Court's view, this language is "intended to underscore that the employer's act or failure to act must be more than mere negligence, that is, a failure to act to protect a person who might foreseeably be injured from an appreciable risk of harm." 551 N.W.2d at 145. Instead, "[a]n employer is deemed to have possessed the requisite state of mind when it disregards actual knowledge that an injury is certain to occur." 551 N.W.2d at 145. In sum, under this sentence of the exclusive remedy provision read as a whole, "if an employer disregards actual knowledge that an injury is certain to occur, the law will not permit him to claim he did not intend to injure," even absent direct evidence of such an intent. 551 N.W.2d at 145.

The Court then applied its interpretation of the "exclusive remedy" provision to the facts of the two cases before it. In one, plaintiff Aimee Sue Travis was severely injured when a press improperly "double cycled" — that is, continued to operate even though the plaintiff's hands were not on the "palm buttons" that ordinarily had to be

9

pressed for the machinery to function. Travis's supervisor, William Clarke, had been aware of similar malfunctions over the past month, and had responded to these episodes by making adjustments that would temporarily correct the problem. Nobody had been injured on these prior occasions, and Travis had not been informed about these incidents.

The most recent episode of "double cycling" had occurred the day before Travis was injured. Another supervisor opined that the usual adjustment would no longer correct the problem, and that it instead would be necessary to entirely shut down and tear down the press in order to repair it. Clarke refused to do so, however, under the belief that this process "would take too long and the parts would have to be sent out." Travis, 551 N.W.2d at 136. Instead, Clarke performed his usual adjustment, and Travis's injuries ensued the next day.

Under these facts, the Michigan Supreme Court held that the "intentional tort" exception did not apply. While the defendant employer, through Travis's supervisor William Clarke, had actual knowledge that the press was malfunctioning, the Court found that Clarke "did not have knowledge that an injury was certain to occur." 551 N.W.2d at 146. The Court reasoned:

> It is true that concealing a known danger from an employee who has no independent knowledge of the danger may be evidence of an intent to injure. However, in this case . . . , plaintiff was not required to confront a continually operating dangerous condition. The press double cycled only intermittently. Further evidence that the injury was not certain to occur is that Clarke was willing to operate the press himself. Additionally, Clarke had adjusted the machine just before assigning plaintiff to it. In the past, such adjustments would allow the press to run for at least one or two days

10

> without double cycling. Moreover, the press cycled so slowly that no one
> had ever been injured when the press double cycled previously. All prior
> operators were able to withdraw their hands in time. We find that an injury
> was not certain to occur because plaintiff was not required to confront a
> continuously operating dangerous condition.

551 N.W.2d at 146-47. The Court further observed that Clarke's adjustment of the press

shortly before Travis's injury, even if deemed inadequate by a fellow supervisor, did not

reflect his "willful disregard" of a known danger. 551 N.W.2d at 147.

In the second case before the Court, plaintiff Stanislaw Golec was severely burned

while using a tractor to load scrap metal into a furnace. This operation normally was

performed with a tractor with a plexiglass splash guard, but this vehicle was out of

service, leaving only a tractor without a splash guard. According to Golec, his employer

was aware that scrap piles that are wet or that contain closed aerosol cans can explode

when placed into the furnace, and he denied his employer's assertion that he was

instructed to separate aerosol cans from the rest of the scrap before loading the furnace.

Golec further asserted that his employer was specifically aware on the night of his injury

that the scrap pile was damp and contained aerosol cans -- indeed, earlier this very same

night, Golec had suffered slight burns in a minor explosion while placing scrap into the

furnace. Upon reporting this incident to the shift leader, Golec was ordered to return to

work, without any effort by his employer to inspect the furnace, ensure that Golec was

using proper loading techniques, or conduct any other sort of investigation. A few hours

later, Golec was again loading the furnace with scrap when a huge explosion showered

11

him with molten metal.

The Supreme Court found that Golec's allegations, if proven, would support a finding that his employer had committed an "intentional tort" within the meaning of the WDCA's exclusive remedy provision. Assuming that Golec could persuade a jury to accept his theory of the cause of the explosion over his employer's competing theories, the Court found that Golec had produced sufficient evidence of his employer's actual knowledge "that closed aerosol cans and water could cause explosions and that both were present in the scrap loaded by plaintiff." 551 N.W.2d at 147-48. The Court further concluded that Golec had raised an issue of fact as to whether injury was "certain" to occur, where his allegations and evidence indicated that any load of scrap containing aerosol cans or water "had the potential to explode," thereby suggesting the "existence of a continually operative dangerous condition." 551 N.W.2d at 148. Finally, as evidence of "willful disregard" of this certainty of injury, the Court cited the testimony that Golec had been ordered back to work after the earlier, smaller explosion without any effort to investigate this incident or take any remedial action. 551 N.W.2d at 148.

Apart from this controlling Michigan Supreme Court ruling, the parties have identified a number of other Michigan court decisions that have construed and applied the WDCA's exclusive remedy provision and its intentional tort exception. The Court addresses these decisions below, as pertinent to the issues implicated by the particular facts and circumstances of this case.

12

2.     **The Record Fails as a Matter of Law to Establish an "Intentional Tort" Within the Meaning of the WDCA's Exclusive Remedy Provision.**

Having set forth the governing legal standards, the Court returns to the dispositive issue presented in Defendant's motion — namely, whether the record, viewed in a light most favorable to Plaintiff, establishes an "intentional tort" as defined in Michigan's WDCA. The Court agrees with Defendant that it does not.

As observed in Travis, the WDCA's exclusive remedy provision establishes two avenues of proving that the "intentional tort" exception applies in a particular case. Under the first, a plaintiff must show that he was "injured as a result of a deliberate act of the employer and the employer specifically intended an injury." Mich. Comp. Laws § 418.131(1). In the absence, however, of "direct evidence of intent to injure," the statute permits the requisite element of intent to be "proved with circumstantial evidence" — that is, to be "infer[red] . . . from the surrounding circumstances" of a particular case. Travis, 551 N.W.2d at 143. Here, Plaintiff does not claim, and the record does not disclose, that he has produced direct evidence of Defendant's intent to injure. Rather, he seeks to prove this intent circumstantially, by showing that Defendant, through its supervisory employees, "had actual knowledge that an injury was certain to occur and willfully disregarded that knowledge." Mich. Comp. Laws § 418.131(1). Accordingly, the Court turns to the three prongs of this analysis as explicated by the Michigan Supreme Court in Travis.

13

The first question under this circumstantial approach is whether the evidence, viewed in Plaintiff's favor, establishes Defendant's "actual knowledge," as opposed to "constructive, implied, or imputed knowledge." Travis, 551 N.W.2d at 143. This standard, as noted earlier, can be satisfied "by showing that a supervisory or managerial employee had actual knowledge that an injury would follow from what the employer deliberately did or did not do." 551 N.W.2d at 143. This standard is met here, in Plaintiff's view, through the affidavit of his direct supervisor at the time of his injury, Carl Hawkins, who professes his "actual knowledge" (i) that "the procedure utilized by the maintenance crew to effectuate the flipping of a die was dangerous," (ii) that "there had not been adequate safeguards employed to avoid injury to employees involved in the die flipping process," (iii) that, given "the lack of a standardized procedure, coupled with lack of appropriate training, an injury would occur to employees involved in the die flipping process," and (iv) that "without proper equipment, without proper training, and without proper standardized procedures an injury was certain to occur during the die flipping process." (Plaintiff's Response, Ex. 2, Hawkins Aff. at ¶¶ 6, 7, 8, 12.) In addition, Plaintiff testified at his deposition that he viewed the die-flipping process as dangerous, that he conveyed this belief to his supervisors, and that they expressed their agreement with this concern. The Court agrees with Plaintiff that Hawkins's assertions and his own testimony, if accepted by the trier of fact, would establish Defendant's "actual knowledge" of some sort of risk, at least, that injury could result from the die-

14

flipping procedure employed by Defendant's workforce.

Under the WDCA, however, the "actual knowledge" that an employer must possess is that "an injury was certain to occur." Mich. Comp. Laws § 418.131(1). This cannot be demonstrated through "the laws of probability" or an expert's "conclusory statements" that merely "parrot[] the language of the legal test." Travis, 551 N.W.2d at 143-44. Nor is it "enough that the employer know that a dangerous condition exists"   ﹣ rather, the employer must "be aware that injury is certain to occur from what the actor does." 551 N.W.2d at 144. This "very high threshold" can be met through evidence that the "employer subject[ed] an employee to a continuously operative dangerous condition that it kn[ew] w[ould] cause an injury, yet refrain[ed] from informing the employee about the dangerous condition." 551 N.W.2d at 144-45.

The "actual knowledge" identified in Carl Hawkins's affidavit and elsewhere in the record does not satisfy this "certain injury" standard. This evidence establishes, at most, Defendant's awareness that the die-flipping procedure posed a generalized danger to its maintenance workers. Yet, the Michigan courts have explained that "[a]n employer's knowledge of general risks is insufficient to establish an intentional tort." Herman v. City of Detroit, 261 Mich. App. 141, 680 N.W.2d 71, 77 (2004); see also Agee v. Ford Motor Co., 208 Mich. App. 363, 528 N.W.2d 768, 770 (1995) (reasoning that an employer cannot be charged with actual knowledge of certain injury "simply because it had knowledge of the general risks" that existed in a work environment).

15

Nothing in the record in this case reflects a specific awareness that injury was "certain to occur" as a result of some particular aspect of the die-flipping procedure, as opposed to a generalized notion that the flipping of heavy tools poses a risk of injury to the workers engaged in this process.

Moreover, there is no evidence of Defendant's awareness that injury was certain to occur as a result of *its* acts or omissions, see Travis, 551 N.W.2d at 144, as opposed to the actions of an individual employee during the course of a particular die-flipping operation. While Hawkins's affidavit reflects his awareness of the dangers generally posed by the die-flipping process, he does not identify any specific aspect of this procedure that was implemented or endorsed by Defendant's management and that elevated the degree of risk to a certainty of injury. In particular, neither Hawkins's affidavit nor anything else in the record forges the necessary link between Defendant's acts or omissions and the particular circumstances that led to Plaintiff's injury.

In this instance, Plaintiff was injured as he ran around to the other side of the die to ascertain why it would not lie down flat on the ground after it had been flipped. There is no evidence that Defendant's management endorsed this course of action — or, indeed, that it was even aware that this problem might arise, or that workers might move within close range of the die or the forklift in order to investigate such a problem. To the contrary, Plaintiff testified that it was his on-the-spot and "split second" decision alone to run around to the other side of the die, thereby abandoning his earlier position at a safe

16

distance away from the threat of injury. (See Defendant's Motion, Ex. 2, Plaintiff's Dep. at 88-90.) Such on-the-spot decisions foreclose a claim of actual knowledge of certain injury. See Palazzola v. Karmazin Products Corp., 223 Mich. App. 141, 565 N.W.2d 868, 874 (1997).

For similar reasons, Plaintiff cannot demonstrate the requisite actual knowledge of certain injury by pointing to different equipment Defendant might have purchased or additional training it might have provided. Again, while Hawkins's affidavit suggests that an injury was "certain to occur" in light of Defendant's failure to provide the proper equipment and training, the record is devoid of evidence linking the specific incident in this case to a want of training or equipment. Rather, it is a matter of sheer speculation whether such training would have advised employees of what to do if a die fails to completely flip, or whether different equipment would have prevented such an occurrence. And, again, there is no evidence of Defendant's awareness of a need to address such a situation, whether through additional training, new equipment, or otherwise. The courts have held that such generalized claims of inadequate training or lack of protective devices, without more, are reflective only of negligence that does not satisfy the WDCA's intentional tort standard. See, e.g., Upsher v. Grosse Pointe Public School System, 285 F.3d 448, 455-56 (6th Cir. 2002); Tolbert v. U.S. Truck Co., 179 Mich. App. 471, 446 N.W.2d 484, 486 (1989).

The definitive statements of "actual knowledge" in Carl Hawkins's affidavit

17

cannot overcome these evidentiary deficiencies. If an expert's "conclusory statements" that "merely parrot[]" the statutory language do not suffice to establish a certainty of injury, Travis, 551 N.W.2d at 143-44, surely a lay witness's similar statements can fare no better. In his affidavit, Hawkins does not identify any specific aspect of the die-flipping process that was certain to cause injury, much less suggest the basis for his sweeping conclusion that the procedure as a whole was certain to result in injury. Nor does Hawkins explain how he was able to determine that the die-flipping process was not merely dangerous, but *certain* to result in injury.

The only possible ground for his claim of "personal knowledge" on this subject is his reference to "an accident" that previously had occurred during the die-flipping procedure employed by Defendant's workforce. (See Plaintiff's Response, Ex. 2, Hawkins Aff. at ¶ 9.) Yet, Hawkins does not provide any details — *e.g.*, the surrounding circumstances, the particular cause of the accident, or the nature or extent of any resulting injury[2] — that would lend support to a conclusion that some particular aspect of the die-flipping process, at least, had resulted in injury in the past and was likely to do so again. Even then, of course, Plaintiff still would have to produce evidence that this particular aspect of the process also caused his injury, and that this problematic aspect of die-flipping was not merely likely but certain to result in injury. No such evidence can be

---

[2]Notably, Plaintiff testified at his deposition that he was unaware of anyone previously having been injured in the die-flipping process. (See Defendant's Motion, Ex. 2, Plaintiff's Dep. at 88.) Hawkins's affidavit is not to the contrary, but refers only to "an accident" that occurred prior to Plaintiff's injury. (See Plaintiff's Response, Ex. 2, Hawkins Aff. at ¶ 9.)

18

found in the record. Accordingly, the Court rejects Plaintiff's contention that summary judgment is inappropriate here in light of Carl Hawkins's conclusory and unsupported assertions regarding his "actual knowledge" of "certain injury."

Finally, the record fails to establish the third element of the circumstantial approach to demonstrating an intentional tort · · namely, that Defendant "willfully disregarded" its knowledge of certain injury. Since there is no evidence of any prior injuries during the die-flipping process, it cannot be said that Defendant failed to take appropriate action in response to such an incident, much less that it "willfully disregarded" the danger revealed through such an incident. Similarly, there is no evidence of management's awareness (i) that a worker might enter the zone of danger during the die-flipping process to determine why a die had not completely flipped, or (ii) that an I-beam might be dislodged from a forklift during the die-flipping procedure. It follows that Defendant cannot be deemed to have "willfully disregarded" any such knowledge as to the circumstances surrounding Plaintiff's injury.

As his sole evidence bearing upon Defendant's "willful disregard," Plaintiff points to the decision by Defendant's management not to purchase equipment that promised to improve the safety of the die-flipping process. Yet, the record does not disclose (i) what aspects of the die-flipping procedure might have been different as a result of this contemplated purchase, or (ii) what effect these changes might have had upon the specific chain of events in this case — *i.e.*, an employee running around to the other side

19

of a die that failed to completely flip. Nor does the record reveal the basis for

Defendant's decision not to purchase new equipment - - whether, for example,

management made a reasoned business decision that any modest safety improvements

were not worth the cost, or whether Defendant simply determined that no expenditure

would be made, no matter how minor the cost or how significant the gains to worker

safety. Absent such evidence, the bare fact of Defendant's failure to purchase equipment

cannot be said to reflect the company's willful disregard for a known danger of certain

injury.

Before leaving this matter, it bears emphasis that the record in this case fails to

disclose the actual cause of the incident that resulted in Plaintiff's injury. Plaintiff

himself can only speculate that either the chains connecting the die to the I-beam broke

loose or some slack developed in the chains, allowing the I-beam to slip off of the

forklift. Nothing else in the record sheds any light on these or other possible causes of

the incident. Under these circumstances, it would be difficult, if not impossible, to

demonstrate the requisite "actual knowledge that an injury was certain to occur," Mich.

Comp. Laws § 418.131(1), where nobody knows, even to this day, what caused the

particular injury at issue here. If a specific danger is not ascertainable even in hindsight,

surely an employer could not have known at the time that its workforce was exposed to a

dangerous condition that was certain to cause injury. Consequently, the Court finds that

the intentional tort exception to the WDCA's exclusive remedy provision does not apply

20

in this case.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's December

29, 2004 Motion for Summary Judgment is GRANTED.


                         s/Gerald E. Rosen
                         Gerald E. Rosen
                         United States District Judge

Dated:  March 24, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 24, 2006, by electronic and/or ordinary mail.

                         s/LaShawn R. Saulsberry
                         Case Manager

21